UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No.: 18-82 (SRN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | PLEA AGREEMENT AND |
| | ) | SENTENCING STIPULATIONS |
| v. | ) | |
| | ) | |
| THOMAS WILLIAM POPLAR, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America and THOMAS WILLIAM POPLAR (hereinafter referred to as the "defendant") agree to resolve this case on the terms and conditions that follow. This plea agreement binds only the defendant and the United States Attorney's Office for the District of Minnesota. This agreement does not bind any other United States Attorney's Office or any other federal or state agency.

1. **Charges**. The defendant agrees to plead guilty to Count 1 of the Information, which charges the defendant with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956.

2. **Factual Basis**. The defendant agrees to the following facts and further agrees that, were this matter to go to trial, the United States would prove the following facts beyond a reasonable doubt:

From in or about May 2013 through in or about November 2016, defendant was the General Sales Manager for Gurnee Dodge, a Chrysler dealership located in Gurnee, Illinois, that sold new and used vehicles. Ruslan Furman ("Furman") was a salesperson,

SCANNED
CLK
OCT 0 2 2018
U.S. DISTRICT COURT ST. PAUL

or facilitated sales, for Gurnee Dodge. All Auto Care and Sales, Inc., was an auto repair business located in Hopkins, Minnesota, with a dealership license that permitted it to buy and sell vehicles at auto auctions in the State of Minnesota. Valeriy Loevski was the owner and Vladimir Valentonovich Chevtayev ("Chevtayev") was an Officer of the All Auto Care business.

From in or about May 2013 through in or about November 2016, Defendant, Chevtayev, Furman, and other coconspirators known and unknown, conspired to defraud financial institutions (the "victim lenders") out of money through an elaborate auto-financing scheme. As part of the scheme to defraud, Defendant and his conspirators applied for the financing required to purchase vehicles, typically luxury vehicles, using buyers who were either deceased, who had sold the use of their identities to the Defendant and his coconspirators, or whose identities were stolen (collectively "straw buyers"). In nearly all cases, the loan applications submitted to the victim lenders by Defendant and his coconspirators contained material misstatements about the identity of the straw buyer, the straw buyer's creditworthiness, or both.

Either Chevtayev, Furman, or Defendant, identified the vehicles used in the scheme, often using vehicles in Gurnee Dodge's inventory or All Auto Care's inventory in support of the scheme. In other instances, the vehicles themselves did not exist, but Chevtayev and others obtained fraudulent title documents for these "ghost" vehicles so that they could be "sold." As part of the scheme to defraud, the vehicles were "sold" by All Auto Care to

Gurnee Dodge, and then by Gurnee Dodge to straw buyers using fraudulently obtained financing.

Chevtayev and other coconspirators known and unknown, provided the identification information of the straw buyers to Defendant. Defendant used the identification information to apply for financing from victim lenders to accomplish the purchase of the vehicles in the name of the straw buyers. The Defendant electronically submitted, or caused to be submitted, these fraudulent finance applications to the victim lenders. In many instances, Defendant and his co-conspirators financed multiple vehicles on the same day for each straw buyer.

As part of the scheme, Defendant prepared check requests to "purchase" the vehicles from All Auto Care in Minnesota. The check request was an internal Gurnee Dodge document that produced a check, payable to All Auto Care, that was used to accomplish the transaction.

The proceeds from the fraudulent loan applications were wired in interstate commerce from the victim lenders to bank accounts in the name of Gurnee Dodge.

After obtaining the fraudulent loan proceeds, Defendant, Chevtayev, Furman, and others, conspired to launder the money by concealing the true nature, destination, and ownership, of the proceeds. For example, after the money was wired by the victim lenders to Gurnee Dodge, Defendant provided checks made out to All Auto Care and provided them to Chevtayev or Furman who would deposit them, or cause them to be deposited in bank accounts in the name of All Auto Care. Money was then withdrawn in cash or

transferred to accounts controlled by Chevtayev.  Chevtayev would then give a portion of the money to Defendant and Furman via wire transfer, by check, or in cash for their role in the scheme.

The conspirators used the fraudulently obtained loan proceeds to make a nominal number of "lulling" payments to the victim lenders to avoid having the lender report the vehicle as stolen.

In one instance, after victim lenders learned of the fraudulent financing, Defendant fraudulently obtained approximately $89,000 by financing another fictitious vehicle purchase and used some of this money to make payments to the lenders in order to delay the discovery of the prior fraudulent loans.

Defendant and the coconspirators fraudulently obtained vehicle loans from in or around May 2013 through in or around November 2016.  The approximate loss to the victim lenders exceeds one million dollars.

**The Fraudulent Transactions Involving Straw Purchaser V.P.**

In one example of the scheme, Chevtayev recruited a straw purchaser, V.P., who fraudulently allowed the use of his identity, purportedly to purchase three vehicles (a 2016 Lexus, a 2016 BMW, and a 2015 Audi), in V.P.'s name.  Chevtayev and the Defendant then fabricated the sale of these three vehicles by All Auto Care to Gurnee Dodge.  In reality, the three vehicles were "ghost" vehicles that existed on paper only.  In order to accomplish the purported sale, Chevtayev obtained fictitious title documents for these three "ghost" vehicles.   Chevtayev then provided Furman and Defendant both V.P.'s

identification information and the fabricated vehicle information in order to accomplish the phony sales transaction.

As part of the scheme, on or about September 30, 2016, Defendant electronically submitted three false loan applications – one for each vehicle – to three different victim lenders. The three loan applications grossly overstated V.P.'s income. V.P., in reality, would not have been qualified to obtain a loan for even one of the vehicles, let alone all three.

As part of the scheme, on or about September 30, 2016, Defendant prepared a check request causing Gurnee Dodge to create checks made out to All Auto Care. By October 3, 2016, Gurnee Dodge printed three checks for the "purchase" of the three fictitious vehicles from All Auto Care. Defendant held the checks until he received the money from the three victim lenders.

In response to the fraudulently submitted loan applications and the materially false representations about the straw buyers contained therein, on or about October 5, 2016, each victim lender wired through interstate commerce loan proceeds to Gurnee Dodge's bank account.

On or about October 13, 2016, V.P. and Chevtayev traveled from Minnesota to Gurnee Dodge in Illinois. There, V.P. met with Chevtayev, Furman, and Defendant for the alleged purpose of signing the loan applications. In reality, Defendant not only had already submitted the loan application to the victim lender but also had received $163,651 from the victim lender to accomplish the purchase of the "ghost" vehicles. Thereafter,

Defendant gave Chevtayev three checks made out to All Auto Care totaling $140,500 from Gurnee Dodge. V.P. and Chevtayev returned to Minnesota with the three checks.

On or about October 14, 2016, the three checks totaling $140,500 from Gurnee Dodge were deposited into a bank account in the name of All Auto Care. On that same day, Chevtayev wired $43,000 to Defendant's bank account. After receiving the wire, Defendant obtained a $4,000 cashier's check in the name of Furman's girlfriend, as well as some cash, and gave this money to Furman. This money represented Furman's share for his participation in this fraud scheme. Defendant retained the balance of the fraudulently obtained $43,000 for his own use.

On October 18, 2016, Chevtayev received three cashier's checks totaling $66,500 from All Auto Care, which he in turn deposited into personal bank accounts controlled by him. V.P. was given $9,000, in checks from the All Auto Care business and Chevtayev retained the balance of the fraudulently obtained $66,500 for his own use and to use in furtherance of other fraudulent transactions.

V.P. was given the money as his share for participating in the scheme and to use to make a few nominal check payments to the lenders on the loans; however, V.P. ultimately stopped making payments on the fraudulently obtained loans.

3.     **Waiver of Indictment**. The defendant agrees to waive indictment by a grand jury on this charge and to consent to the filing of a criminal information. The defendant further agrees to execute a written waiver of his right to be indicted by a grand jury on this offense.

6

4.    **Waiver of Pretrial Motions**.  The defendant understands and agrees that he has certain rights to file pre-trial motions in this case.  As part of this plea agreement, and based upon the concessions of the United States within this plea agreement, the defendant knowingly, willingly, and voluntarily gives up the right to file pre-trial motions in this case.

5.    **Statutory Penalties**.   The parties agree that Count 1 of the Information carries statutory penalties of:

      a.    a maximum of 20 years' imprisonment;

      b.    a maximum supervised release term of 3 years;

      c.    a maximum fine of $500,000, or twice the gross gain or loss;

      d.    a mandatory special assessment of $100.00;

      e.    payment of mandatory restitution in an amount to be determined by the Court; and

      f.    assessment to the defendant of the costs of prosecution (as defined in 28 U.S.C. §§ 1918(b) and 1920).

6.    **Revocation of Supervised Release**. The defendant understands that if he violates any condition of supervised release, he could be sentenced to an additional term of imprisonment up to the length of the original supervised release term, subject to the statutory maximum set forth in 18 U.S.C. § 3583.

7.    **Guideline Calculations**. The parties acknowledge that the defendant will be sentenced in accordance with the Sentencing Reform Act, 18 U.S.C. § 3551, et seq. Nothing in this plea agreement should be construed to limit the parties from presenting any and all relevant evidence to the Court at sentencing.  The parties also acknowledge that the

Court will consider the United States Sentencing Guidelines in determining the appropriate sentence and stipulate to the following guideline calculations:

    a.    <u>Base Offense Level</u>. The parties agree that the base offense level is **22** because that is the total offense level for the underlying offense (wire fraud) from which the laundered funds were derived. (U.S.S.G. § 2S1.1(a)(2)). That is, pursuant to U.S.S.G. § 2B1.1, the base offense level for wire fraud would be 6 (§ 2B1.1(a)(2)), plus 14 for loss amount, plus 2 as the parties agree the offense involved 10 or more victims (§ 2B1.1(b)(2)(A)).

    b.    <u>Specific Offense Characteristics</u>. The parties agree that the offense level should be increased by **2 levels** because defendant will be convicted under 18 U.S.C. § 1956. (U.S.S.G. § 2S1.1(b)(2)(B)). The parties agree that no other specific offense characteristics apply.

    d.    <u>Acceptance of Responsibility</u>. The United States agrees to recommend that the defendant receive a **3-level** reduction for acceptance of responsibility and to make any appropriate motions with the Court. This would result in an adjusted offense level of **21**. However, the defendant understands and agrees that this recommendation is conditioned upon the following: (i) the defendant testifies truthfully during the change of plea and sentencing hearings, (ii) the defendant provides complete and truthful information to the Probation Office in the pre-sentence investigation, and (iii) the defendant commits no further acts inconsistent with acceptance of responsibility. (U.S.S.G. § 3E1.1).

    e.    <u>Criminal History Category</u>. Based on information available at this time, the parties believe that the defendant's criminal history category is **I**. This does not constitute a stipulation, but a belief based on an assessment of the information currently known. The defendant's actual criminal history and related status (which might impact the defendant's adjusted offense level) will be determined by the Court based on the information presented in the Presentence Report and by the parties at the time of sentencing.

    f.    <u>Imprisonment Range</u>. If the total offense level is **21** and the criminal history category is **I**, the Guidelines imprisonment range is **37 to 46** months. (U.S.S.G. Ch. 5, Pt. A).

g.    <u>Fine Range</u>.  If the offense level is 21, the Guidelines fine range is **$15,000 to $150,000**.  (U.S.S.G. § 5E1.2(c)(3)).

i.    <u>Supervised Release</u>.  The Guidelines advise a term of supervised release of **at least one year but not more than three years** of supervised release.  (U.S.S.G. § 5D1.2(a)(2)).

j.    <u>Sentencing Recommendation and Departures</u>.  The parties reserve the right to make motions for departures from the applicable Sentencing Guidelines range and to oppose any such motions made by the opposing party.  The parties reserve the right to argue for a sentence outside the applicable Sentencing Guidelines range.

8.    **Discretion of the Court**.  The foregoing stipulations are binding on the parties, but do not bind the Court.  The parties understand that the Sentencing Guidelines are advisory and their application is a matter that falls solely within the Court's discretion. The Court may make its own determination regarding the applicable Guideline factors and the applicable criminal history category.  The Court may also depart from the applicable Sentencing Guidelines range.  If the Court determines that the applicable Guideline calculations or the defendant's criminal history category is different from that stated above, the parties may not withdraw from this agreement, and the defendant will be sentenced pursuant to the Court's determinations.

9.    **Special Assessment**.  The Sentencing Guidelines require payment of a special assessment in the amount of $100.00 for each felony count of which the defendant is convicted. U.S.S.G. § 5E1.3.  The defendant agrees to pay the $100 special assessment before sentencing.

10.    **Restitution**. The defendant understands and agrees that the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, applies and that the Court is required to order

the defendant to make restitution to the victims of his crime.   Currently, there is no agreement as to the amount of restitution.

The defendant represents that the defendant will fully and completely disclose to the United States Attorney's Office the existence and location of any assets in which the defendant has any right, title, or interest.  The defendant agrees to assist the United States in identifying, locating, returning, and transferring assets for use in payment of restitution and fines ordered by the Court.  The defendant agrees to complete a financial statement fully and truthfully before the date of sentencing.

11.    **Waivers of Appeal and Collateral Attack**. The defendant understands that 18 U.S.C. § 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this right, and in exchange for the concessions made by the United States in this plea agreement, the defendant hereby waives all rights conferred by 18 U.S.C. § 3742 to appeal the defendant's sentence, unless the sentence exceeds 46 months of imprisonment.  In addition, the defendant expressly waives the right to petition under 28 U.S.C. § 2255.  The United States also waives its right to seek appellate review of any sentence imposed by the Count on any ground set forth in 18 U.S.C. § 3742 unless the sentence is less than 37 months of imprisonment.  However, the waivers by the defendant noted above shall not apply to a direct appeal or post-conviction collateral attack based on a claim of ineffective assistance of counsel.  The defendant has discussed these rights with his attorney. The defendant understands the rights being waived, and he waives these rights knowingly, intelligently, and voluntarily.

10

12.     **Freedom of Information Act Waiver**.  The defendant waives all rights to obtain, directly or through others, information about the investigation and prosecution of this case under the Freedom of Information Act and the Privacy Act of 1974, 5 U.S.C. §§ 552, 552A.

13.     **Forfeiture**.   The defendant understands and agrees that the United States reserves its right to seek a personal money judgment forfeiture against the defendant in this action, and to proceed against any of the defendant's property, whether directly forfeitable or substitute property, in a civil, criminal, or administrative forfeiture action if said property is subject to forfeiture under federal law.   The defendant agrees not to contest any such forfeiture proceedings.

14.     **Complete Agreement**. This, along with any agreement signed by the parties before entry of plea, is the entire agreement and understanding between the United States and the defendant.

Date:   *10/2/18*

GREGORY G. BROOKER
United States Attorney


BY: JULIE E. ALLYN
Assistant United States Attorney

Date: *10/2/18*


THOMAS WILLIAM POPLAR
Defendant

Date: *10-2-18*


ROBERT A. LENGELING, Esq.
Counsel for Defendant